with the first one, Williams v. New York City Housing Authority, 21-1527. Good morning, your honors. Good morning. May it please the court. My name is Marcel Florestal, and I represent the plaintiff, Appellant Allison Williams, in this matter. You represented Civil Code, too, didn't you? Yes, I do, ma'am, your honor, I'm sorry. I represent the plaintiff in this matter, Alice Williams. Your honor, this court should reverse the lower court's decision below. Because in addition to misapplying the well-established totality of the circumstances standard, as illustrated in plaintiff's briefs, this court committed three crucial errors. Number one, this court failed to take into account the relevant element of intent. NYCHA defendants intent in trying to remove Allison Williams. Now, that's important because by not taking into account the relevant element of intent, this court effectively stripped plaintiff of their opportunity to establish a pretext under the third prong of the McDonough-Douglas burden-shifting rule. Is this not just a hostile work environment claim? No, it's not, your honor. Well, but isn't that the basic theory of your case? Well, yes, a hostile work environment. There's also aiding and abetting. I see. And 83 claims and- Right, but it's hostile work environment, not any specific adverse action. I think that was the meaning of the question. Yes. Right, okay, and further, the elements of the hostile environment, that is to say the hostile things, are, first of all, two meetings in July and  you could find abusive behavior towards Ms. Williams, once by the speaker and once by Mr. Clark. And then in the following months, deliberate understaffing, deliberate is the theory, of her office. Yes. That's basically what we're talking about as constituting the environment. And the inference that one would need to draw based on evidence that Mr. Clark was deliberately attempting, although the plaintiff didn't know it, to remove her from her job. To draw the inference from that, that the rest of the pattern that you allege was also motivated by the same thing. Well, the not knowing part, Your Honor, the not knowing part we believe is factually incorrect, and quite frankly- But did she say in a deposition or in a declaration, I was aware of Mr. Clark's efforts during the time period of the hostile environment, as opposed to later when Ms. Colon told her about it? We'll go through the chronology, Your Honor. The initial offending act occurred July 30th, 2015. Ms. Colon was removed from her position in August of 2015. Now, Plaintiff Allison Williams, she filed her notice of claim in September of 2015 making these very same allegations. So she did know that this was going on. Well, is it the same allegations, the allegations about Mr. Clark? Well, with respect to creating the hostile working environment, she said yes, hostile work environment. Well, but see, I think the question that I'm focused on here is, it seems to me that two instances in which people are harshly critical of her does not necessarily amount to a hostile work environment, and that it would be necessary to add the rest to find the pattern. And the problem with that, and I'm not sure it's a fatal problem at all, is I'm looking for the evidence that would indicate that the understaffing is deliberate. Well, a few things. First, I'd like to respectfully point this court to its previous decision in which it said, an employer who discriminates is not going to leave a well marked trail. Well, this one did, actually, at a certain point. We were lucky. Well, not just lucky, I mean, the conduct was overt. Yes. But then he was told to stand down, basically, by the legal department and HR. That's alleged, but your honor, I'd like to point out that everything began after July 30th, with respect to the understaffing, with respect to the removing of the superintendent. Everything occurred after July 30th. Prior to July 30th, she had no issues with understaffing. She had a full staff for housing assistance, I believe. Including a Spanish speaking manager. Exactly, including a Spanish speaking manager, prior to July 30th. So there was nothing going on, no attempt to remove her or anything of the sort. So everything started happening after July 30th of 2015. So what is the evidence of her awareness that this is going on? Well, number one, as I mentioned, notice of claim. She filed her notice of claim making these allegations. What's number two? Number two, my point was, it's legally irrelevant that she doesn't know of every bad act that's contributing to her hostile work environment. And the Second Circuit has echoed that. As long as she feels it's hostile. Well, exactly, as long as she feels it's hostile. But not only that, but you have to take into account the whole environment. Here, the local court didn't even take into account the fact that Sybil Colon, as you pointed out, Sybil Colon was removed from her position because she chose to stand up against what she viewed as racist. But not only her, James Otters, who was actually Allison Williams, the plaintiff's immediate supervisor, after the July 30th meeting. They all said, hey, this is racist. Sybil Colon said, I can't believe I'm being asked to discriminate. Allison Williams was in tears. So you have objective perception of the discrimination, and you have subjective on the part of Allison Williams. I have a question about the New York City human rights law. Yes. I didn't think that the district judge did any analysis, really, of the city human rights law. But because of, for your claims to survive, you must establish a tribal issue of fact as to Ms. Williams' differential treatment. Yes. In other words, she was treated less well because of a discriminatory attempt. Who was Ms. Williams treated less well than? Well, that's a good point. That's a good point, Your Honor. We could, again, going back to employers are not going to leave a well marked trail. We know for a fact that Melissa Marverito, the council speaker, said, I want a Spanish manager. We know that subsequent to her saying that, Brian Clark, another defendant, instructed Ms. Colon to remove Ms. Williams and replace her with a Spanish manager. All right, but that's not what I asked. In order to survive under the city human rights act, you have to say that she was treated less well than someone. So who was she treated less well than? Who's the comparator? Well, the comparator is a non-African American woman. She's African American. She was treated less well than a non- So we don't have a particular person. But is it? I thought your answer was going to be everyone. Is it? Well, everyone who's not- Right, I mean, it's one thing if you're sort of finessing little differences in treatment. And the question is, well, who got better than that? But I'd be surprised if the city was going to say, we always fire managers because of their ethnicity. So she's not treated any differently than anybody else. The specific kind of conduct that you're talking about, at least in terms of the attempt to remove her, is, one would hope, sui generis. So this isn't something that's commonly done throughout the agency. Right? I mean, it seems like a reasonable inference. No, I agree, Your Honor. And the reason I didn't use everyone is because everyone means, it could mean somebody who is also African American. Well, maybe, yeah, that's true. But I mean, so long as there are other managers who are not African American, this very specific targeted campaign, if that's what a jury could find. Yes. It's very hard for me to understand an argument that, well, you'd have to find somebody who was what, exactly? Who doesn't then get some racist campaign against them. I would think that- Well, the distinction here is basically black versus Spanish. Yeah, okay. But I would have thought that your answer, in connection with the New York City human rights law, is that she is treated less well than she would have been in the absence of a racist, a racial animus, or some sort of discriminatory motive by her employer. I would like to clear it up. In essence, that's what I'm suggesting, Your Honor. That's exactly what I'm suggesting. I don't know that we've ever, or I'm not aware of a case in New York law that's required a comparator to make a claim under the NYCHR. No, comparators are not required. And if I might add, with respect to the city human rights law. Now, a city human rights law is a different animal, as Your Honors are well aware. And summary judgment cannot be had unless discrimination played zero role in the decision making process. Here, the lower court said, I need not even attempt to discern NYCHR defendants and tent in trying to remove Alice Williams. The district court did not do an analysis of the NYCHR. None whatsoever. Well, I'll ask the government to help that too. Before you leave, could you tell me who Brian Honan was? Brian Honan, we did not depose him. We know that he was pretty high up there. He was at the meeting. Wasn't he a lobbyist for NYCHR? I don't recall. I'm sorry, Your Honor. He was state director of NYCHR Intergovernment Special Legislative Affairs. Yes, Intergovernment, exactly. So he was NYCHR's lobbyist. Yes, yes. There are various NYCHR officials at the meeting on July 3rd. And NYCHR is always interested in increasing its budget. Yes. Either through HUD or through the city or the state. And that's why they have lobbyists. Yes. All right, thank you. Thank you, Your Honor. We'll hear from the, from NYCHR. Good morning, Your Honors. May it please the court. My name is Han Lee. I am appearing on behalf of the NYCHR defendants in this case. That is NYCHR, Michael Kelly, and Brian Clark. Do you call it NYCHR, too, or do we just do it? We do call it NYCHR. Yes, Your Honor. So Sylvia Vega was also in the Legislative Affairs Office, right? I believe so, yes, Your Honor. And so what do I take from the meaning when Sybil Collin said to, let me figure out who she said it to. This is Sybil Collin reply to Mr. Clark. Brian, that's Mr. Honen, who we just agreed was a lobbyist? He was the essential liaison between NYCHR and the, and he was responsible for protecting NYCHR's budget, right? Yes, and I think his office, they act as the liaison with, when we get inquiries from electives, essentially. And he was coordinating this meeting here. So Sybil Collin talked to Saladine, who was in the HR office, I believe. Brian said to tell you that Melissa Mark-Riverito wants it done. It has to be, and Mr. Kelly wants it done. So this is the political interference with the administrative work of NYCHR, correct? I mean, what difference does it make what a lobbyist wants, except everyone paid attention, didn't they? So I think going back to that meeting, Your Honor, as the district court held, that reference, I want a Spanish manager, given the situation of context and how that meeting arose, no rational jury could conclude that the reference Spanish there meant anything other than Spanish speaking. No rational juror could think that, really? So you're actually contesting that there's no rational juror could conclude that that comment followed by Mr. Clark's efforts in the following month were at least plausibly animated by some racial discriminatory motive. It's motivated by the Spanish speaking ability of an employee. It's not motivated by her race. So- Isn't that a jury question, as Judge Lohage suggests, would there are questions to you? Isn't it a jury issue? I don't believe that everything gets- I'm saying that if I, if an employer says I want a Spanish speaker that by itself has no racial element to it, it has an ethnic element, what does it have? I don't want anyone other than a Spanish speaking person. I think if that was the phrase, Your Honor, I don't want anyone other than a Spanish speaking person. Classification, language itself, right, language by itself I guess does not identify- Lots of people speak Spanish who are not of Hispanic descent in any way. There are white people from Ireland who speak Spanish. There are black people from Africa who speak Spanish. People learn Spanish in school or get trained in it by the government if they're in the military or the diplomatic corps. There are lots of Spanish speaking people. But first of all, is it an uncontested fact that even the language that was used at the meeting was a Spanish speaking person? I think there's a lot in the record, Your Honor, yes, that it was about hiring a Spanish speaking- That that's what was said and that's what was meant. But I'm asking you a more direct question. Is it uncontested, is the only evidence that Ms. Mark Viverito said I want a person who speaks Spanish as opposed to I want a Spanish? I thought there was conflicting testimony on that. Yes, absolutely. Thank you, Your Honor. So whether she actually said the words I want a Spanish manager is actually a tribal issue of fact. What the court found is that that issue is not material. Because even if she did say those exact words, right, the hostile work environment claim still fails for a number of reasons. One is- That's a separate issue. But, you know, so are you or are you not contending that no reasonable juror could conclude that the words and the intention were that we want someone who is Hispanic by ethnicity? No, I think that the evidence of the record here shows that the request was to have a Spanish speaking employee in the office. It's actually not even a request for a manager. Testimonial and documentary evidence, which includes a contemporaneous note- There is no evidence in the record to the contrary of that? I'm sorry, could you repeat? I mean, didn't Ms. Williams testify that the reference was I want a Spanish manager? I think that's, yes, Your Honor, that's right. So couldn't a jury believe that and disbelieve the other people who say the opposite? I think that the disrecall held in our position would be that it would- I'm sorry, didn't Judge Broderick actually disagree with your analysis on this? In other words, didn't he say, look, at least it's plausible that that was racially motivated. And so I'll go on to the other elements. Yes, but I think her first analysis- So you're fighting that is the way that at least I've understood so far what you're saying. I think that before she got to that part, she did talk about the situation or context of the meeting and how the idea, with all the complaints that the speaker's office was receiving, the idea was to get- It might be actually useful then to get to the other elements. Okay, same thing, Your Honor. So I'll just quickly touch base on sort of the three other events that this hostile work environment claim was based on. With respect to the August 2015 meeting when Brian Clark asked Ms. Williams, how do you speak to Spanish people? She obviously was offended by that question, but objectively that inquiry is legitimate. It has job-related concern. This is a development that had received complaints from tenants about their inability to communicate with staff. And it was appropriate, and there's nothing sort of racially motivated or hostile about- But I- Nasty to her. Yes, I think her, however, Your Honor, her subjective perception is neither controlling nor sufficient here under the law. Objectively, that inquiry is- I think Colin thought it was also that he treated her badly at that meeting, didn't he? Yes, I think Ms. Williams and- So that's just a question of fact. Why doesn't it go to a jury? Because I think that as a matter of law, that question with a legitimate business motivation is no more than petty- But as soon as you put the motivation into that statement that you made, you've created a contestable issue about what someone meant when they said that. How a reasonable person could perceive that motivation. I think you have a very good jury argument, frankly, that all people are doing, at least all Brian Clark is doing in that meeting, whether he's nasty or un-nasty when he does it, is to inquire about how she and her colleagues deal with people who only speak Spanish who are clients of NYCHA. That's a perfectly reasonable argument to make, but it's an argument. It's hard for me to see why a jury couldn't conclude the opposite, given the whole history. But that initial comment from the council member. That I want someone's Spanish by Spanish. We also know, we have Ms. Colon's testimony about her conversation with HR, where she's basically saying, she perceived it as, I think this is an effort to do something based on ethnicity. That's how she perceived it herself. A Hispanic person perceives it this way. She tells that story to HR, and HR perceives it that way and says, you better stop doing this. The legal department says, this is illegal, you better stop doing this. And you're saying that no reasonable jury could think that that situation was A, and B would be perceived as such by a reasonable person in Ms. Williams' position. I think that there's also much more here in the record, Your Honor, right? It's also, I think, undisputed that there's- Sure, but we're supposed to take the evidence in the light most favorable to the non-moving party. So we don't have to pay attention to any of the other evidence that a jury might find is a basis for rejecting this claim. We have to pay attention to the evidence that favors the plaintiff and see whether that evidence is sufficient that a reasonable jury could draw a conclusion favorable to the plaintiff. That's the standard, right? But there's also no evidence, Your Honor, in the record to show that her work environment was in any way impacted. So one of the items that the district court chose not to include in its analysis of hostile work environment was, I think it was the fifth item, where the housing manager, who was Spanish speaking, was transferred out of Millbrook Houses. The superintendent, yes, Your Honor. Right, the superintendent, Raymond Martinez, I think? Yes. This leads directly to the question of Spanish speaking. How did she deal with the Spanish speaking residents? This guy who helped her, and then he was transferred out. So actually, I'm sorry to interrupt you. So actually, one option was for her and the staff to call the language bank. So that was actually the more common option. The other option was when they were not able to get somebody on the phone, they would use maintenance crew on the development to help with translation. Superintendent Martinez actually was not the only Spanish speaking staff member at Millbrook. There were actually two other employees that spoke Spanish. One was the housing assistant in the management office itself, and there was a supervisor caretaker. So actually, Ms. Williams' claim in her brief that NYCHA didn't care about language access issue and transferred the only Spanish speaking employee out of Millbrook is actually refuted by the record. There were other employees- Is it appropriate for the district court not to include items of four and five that Ms. Williams claimed were contributed to a hostile environment? The reason the district court did not include those events, because there was absolutely no evidence in the record, that the personal changes were facially neutral. The employees either were on medical leave, had a death in the family. But she claimed that the jobs were not filled when she was working with actually fewer housing assistants than there were lines for. That assertion, Your Honor, actually is also not correct and refuted by the record. So she actually, Ms. Williams, in her brief, claims a number of times that she had no staff in late 2015 going into 2016. That's actually entirely not accurate. It is undisputed that at the end of 2000- You disagree? Yes, I do. Why isn't that a jury question? Well, because the whole point is that these personnel changes were facially neutral. They were unconnected to- The choices of those individual employees, people leave. The argument is that they were deliberately not replaced. Now again, I think you'd have a great argument to a jury that, look, this is an agency that is chronically understaffed. It's basically famous for being kind of incompetent. It must be all the time that it takes a long time to get staffing positions filled. And there's nothing racist or hostile to Ms. Williams about that. But that's a jury argument. All of this occurs pretty much in the immediate aftermath of what I think we established a while ago, a jury could find, was a deliberate attempt, ethnically motivated, to remove Ms. Williams. You've also got a good jury argument, it seems to me, that it's a little crazy, isn't it, to think that someone like Brian Clark, who's worried about pleasing the Speaker, and the Speaker is concerned about how the customers, the residents of this project, are treated, would figure that the way to please her is to make them be treated worse for a period of months. But that's, again, a jury argument. That doesn't mean that no reasonable person could think that in light of this effort to remove her for ethnic reasons in July and August, that the inability or choice not to replace her staff in just the following few months, as people start to leave, starting in September, the very next month, through December, why couldn't a reasonable juror think that that's part of the same campaign? I think, Your Honor, because that argument by Ms. Williams is just refuted by the evidence. The evidence shows that actually Ms. Williams did not submit a form that she needed to submit to HR to post those vacancies. And the positions were filled, and actually were filled pretty quickly, Your Honor. In late December 2015, when she had lost two HA, two more HA, and I'm sorry, HA meaning housing assistant, joined in February of 2000. So two months later. Two months later, two more, two new employees. And why isn't that an entirely fair question for a jury to say, is there any evidence, actual evidence in the record? I mean, I made some nasty comment about NYCHA's competence. Is there any actual evidence that it normally takes two months to fill these vacancies? I think the burden here is on Plaintiff, Your Honor, to show that that alleged delay is somehow out of the ordinary. And she actually testified at her deposition that she was never shown any documents or promised additional staffing or expedient staffing in the UPOM program. So the New York City Human Rights Law is not a statute that the district court grappled with extensively. Would you agree with that? Yes, I should, yes. But as you know, it's much more plaintiff friendly in terms of its standard. Can you explain to me how, why as a matter of the New York City Human Rights Law, separate and apart from the supplemental jurisdiction issues that might exist, why that shouldn't go to a jury, why that shouldn't survive? Should not, right, yes. So, Your Honor, I think it's two parts. So, to survive, right, so under the city law, Ms. Williams have to show that she was treated less well, right, on the basis of her protective characteristics. So one here is lacking the evidence of differential treatment, right? There's absolutely no evidence in record that the delays here for filling the vacancies were any sort of longer than a normal NYCHA filling of vacancy, right? There's no evidence that asking her- NYCHA didn't put that evidence in. I know it's her burden, but you didn't put in evidence of filling vacancies of HAs for other housing, did you? I think there was evidence that part of the delay was Ms. Williams failing to submit the necessary form to HR. So this is just HR processing, there's a vacancy, the development need to submit proper paperwork for the vacancy to post. And so Ms. Williams did not do that promptly. But when she did that, the position was filled a month later, I believe. So, and there was also no evidence that, you know, she was treated worse than any other managers on the basis of her race, right? There's no evidence that Brian Clark asking her how she treats, how she speaks with the residents at her development is somehow, you know, he didn't treat any other managers in that hostile way. Respect to the, yeah, I guess I will just stop there. In that there's no evidence of a differential treatment here. There's no evidence that she was treated any less well than any other employee on the basis of her protected characteristic. And that- She doesn't need to show a particular comparator. She just needs to show under the New York City Human Rights Law, I mean, in some other cases I've been involved in, at least taught me this, that she was just treated less well than she would have been, right? But it has to be on the basis of her protected characteristic, Your Honor. But if there's direct evidence from Ms. Colon alone, put aside any other inferences or any other facts, that what she understood Brian Clark to be telling her to convey to HR is specifically that to please the speaker, we have to get a Hispanic manager in there. That's what she thought she was asked to do. She thought she was asked to do it on the basis of race. She was unhappy about that. She also says, I was specifically told by Brian Clark, don't tell HR that that's what we're trying to do, right? That's her testimony. That's her, yes. And she won on summary judgment before the hearing. Why is that not direct evidence that whatever treatment is happening to Ms. Williams in the immediate aftermath of all this could be attributed to her race? But the only thing that allegedly happened to Ms. Williams, Your Honor, is this alleged delay in filling the vacancies. Because we know from the record that the departures of various housing assistance is facially neutral. So her only allegation left is that the only bad thing that was done to her is that somehow NYSJA intentionally did not fill the vacancies. And that is not true when refuted by the record, because the positions were filled. All right, all right, we'll hear from Mr. Young. Thank you, Your Honor. The speaker, Mark Viverito, former speaker, yes. Good morning. Good morning, Your Honors. May it please the court, Philip Young here on behalf of the former city council speaker, Melissa Mark Viverito. So as to the speaker, this appeal boils down to a single state law claim for a hostile work environment. Did the city council have any funding authority over OPMOM? I don't know the answer to that for certain, Your Honor. I believe that the city council generally has some oversight authority over NYCHA, but they have no authority over- 6% of NYCHA's budget comes from the New York City funds. That's from publicly available sources of which I believe we could take judicial notice. So it's a small portion, but we also know that NYCHA is chronically underfunded and they probably are interested in every dollar. Otherwise, why do they even care? Why don't they just tell your client, go away, why do we care what you think? They care what she thinks, right? I mean, that's pretty clear. Certainly, Your Honor. The city council, yes, they have this oversight authority and the city puts money in, as you noted. But what the speaker doesn't have is any authority over the terms and conditions of William's employment. Can't fire her, can't transfer her, can't discipline her. She could make her displeasure known, didn't she? Isn't that what I read? That Brian said to tell you that Melissa Viverito wants it done.  She told that to the woman from the NYCHA Director of Human Resources. I believe the record is that the testimony was that Clark wants it done. I'm not 100% positive on that. I believe it's that Clark wants it done. I think really the only- Yeah, but Brian Clark, Clark's first name is Brian also. And Colon's testimony was that he in fact was the person who told her what to do to go to HR about Ms. Williams. Yes, Your Honor, but again, beyond that initial 20 minute meeting that the speaker had, there's no evidence that the speaker had any further involvement with any of this conduct beyond this point. All that's left is this state law aiding and abetting claim. Williams has waived her city human rights law aiding and abetting claim because she didn't raise it in this brief. And there's several independent reasons to affirm, at least as to the speaker here. I mean, one, there's no evidence of any active participation beyond this limited 20 minute meeting. Two, as to the underlying hostile work environment claim, the speaker's conduct can't be imputed to NYCHA because she's not an employee, an agent, or a contractor. Well, the question isn't really whether her conduct can be imputed to NYCHA. They've got plenty of conduct of their own to worry about. The question is whether NYCHA's conduct can be imputed to the speaker. Right, I mean, if what, I understand the plaintiff's theory to be, and so maybe you could comment on that. That it's all because she set this in motion. She said, I think there should be, or at least the plaintiff's theory is. She said, I think we need essentially a Hispanic manager, not an African American manager. And then, all you have to say is, will no one rid me of this meddlesome priest? And if you're the king, people go out and do it. And I think their theory is that, vis-a-vis NYCHA, if the speaker talks, you're going to listen. Now, the whole agency doesn't necessarily listen. The HR people and the legal department said, don't do that. But if the people who actually, hypothetically, assuming a jury could find this, created a hostile working environment, were doing it essentially because they reasonably understood that the speaker wanted that done. And had expressed that desire. Why, you know, the godfather doesn't have to, in order to aid and abet a murder, have participated in the details of the plot. All he has to do is say, you know, so and so shall sleep with the fishes. And then, they do it. That's their theory. So, what's wrong with that theory? Well, your honor, as to the speaker, the problem is that there is no underlying hostile work environment claim left against the speaker. So, whether NYCHA's conduct could be imputed back to the speaker, it really doesn't matter for purposes. They wanted to please her, as Judge Lynch points out. They wanted very much to please her. I understand that, but the claim here as to the speaker is solely this aiding and abetting. Yes, but what is it, aiding and abetting what? You don't, there's not just a claim of this person aided and abetted something in the atmosphere. The question is, you aided and abetted a violation. And the only violation in play here, I think we established, is a hostile environment claim. Certainly, it has to be aiding and abetting the underlying NYCHA hostile work environment claim. But that claim spans a two-year period from 2015 to 2017 that's based on a series of five different events that occurred. The vast, vast majority of which had enough, there's no evidence in the record that they had anything to do with the speaker here. She didn't have any, there's no evidence. Is it, the problem that I'm having is that this was all set into motion. Let's just assume that that's my view of the record, that this was entirely set in motion by the former speaker's comment. And let's also assume that she intended to set something in motion. So, if you have those two assumptions, what is your response? Your Honor, my response would be that there still wouldn't be a valid underlying hostile work environment claim here because there's no evidence in the record that Williams' work environment was adversely impacted by this conduct. If I were to say, forgive me one second. If I were to say, let's just flip the racial dynamic here. But if I were to say, and I were the speaker or the head of whatever the political entity is, I want all of the black employees fired at this particular agency. And that ended up happening. But I, that was my only comment. And I was charged with an aiding and abetting claim in a civil case. What would be your response to that? Your Honor, I think it would depend very much on the facts. And there you go. Well, let's come back though, maybe I can help you out a little. Is your point something like, she said, giving the best inference possible, all the inferences possible to the plaintiff. She said, transfer this woman out of here and put in a Hispanic person instead. She didn't say, make her life miserable until she retires in two years. They didn't say, she didn't say anything about creating a hostile work environment. She just said, make a personnel switch. That turned out to be impossible because it was perceived by HR and the law department as illegal. Now, if Mr. Clark then goes on to say to himself, I think I can accomplish the same thing by starving her of staff and making life hard on her, and then she'll just go away. Is your point that that's not what was requested? What was requested was a fairly simple thing that didn't happen? Yes, at worst. I understand that you contest that that's what she said or what she meant or anything of the sort. Yes, Your Honor. I mean, more or less, that's my point, is that the evidence we have here, as to the speaker, is this 20-minute meeting. And aside from the conduct of that 20-minute meeting, there's no evidence that she participated in some type of active campaign of discrimination, actively participated in the August 28, 2015 meeting. In other words, there's no evidence of really, I think maybe what you're saying is no evidence that when she said, when she made that particular comment, she intended to create a hostile work environment as to Williams. Yes, that's correct, Your Honor. That's certainly our position, is that in order to be liable under aiding and abetting, there has to be evidence of an intent to participate in the discrimination that's then carried out by the primary actor. And here, we just don't have that evidence. And what your adversary says, I think, is that this analysis of intent was not sufficiently done by the district court judge. What's your response to that? Well, the district court judge didn't have to analyze intent, because he resolved the aiding and abetting claims solely based on his conclusion that no reasonable juror could find an underlying hostile work environment claim. Those are sort of two separate ways that you could go about resolving them. Right, I mean, your client wins if NYCHA wins automatically, because she can't have aided and abetted something that didn't happen. That's correct. A reasonable juror couldn't find it. So what if we disagree, just hypothetically, with that second proposition? In other words, if there's not sufficient evidence of a hostile work environment, then how do we grapple with this intent issue? Your Honor, you grapple with the intent issue by looking at all of the evidence in the record and the testimony. And there's simply nothing here, again, aside from this 20-minute meeting. Remember, there's no evidence, for example, that the former speaker reached out to NYCHA after the meeting to ask about follow-up or next steps. There's no evidence that the former speaker ever spoke with Williams again. There's no evidence that the former speaker had any role in the dispute over missing housing assistance and the replacement of the superintendent. And all of that evidence together, I think, shows that there's no disputed issue of fact about an intent to actively participate in the campaign of discrimination. Thank you very much. Thank you, Your Honors. Mr. Forrestal, you're reserved two minutes for the vote. Good morning again, Your Honors. May it please the Court. Your Honors, I'd like to clear up something here. I hear this a lot with respect to the executive law section 296-6. A lot of people just colloquially term it the aiding and abetting law. But 296-6 is much more than aiding and abetting. 296-6 prohibits aiding, abetting, inciting, coercing, and the attempt to do these things. So even if you are not successful, the attempt is also a violation of 296-6. So here- Well, but it has to happen, right? Are you saying that there's a cause of action, a civil cause of action, for inciting someone to discriminate, for example, and that person says, sorry, that's unlawful, and I will not do it, and nothing ever happens. You're saying that the incitement itself creates a cause of action? I beg Your Honor's pardon, I think the statute speaks for itself. I think it makes these distinctions, aiding, abetting, inciting, coercing, compelling. And you've got an attempt to do so also. A violation. I'm sorry? A violation. Yeah, exactly. So if you attempt to do the violation and you're not successful, I think on face value that's a violation of the act in and of itself. And what would be the damages from that? Well, that all depends. That all depends. If I could see some emotional damages with respect to attempting to do something. Like here, for instance, they attempted to remove Allison Williams. They did not, ultimately she was forced out. In other words, she left in May 2017 earlier than she would have. They attempted to do it, but they were not successful. But in addition to that, Council Speaker incited the discriminatory act by saying, I want a Spanish manager. So on July 30th, 2015, the inciting is the participatory act with respect to 296-6. So I just want to clear that up. A lot of people think it's just aiding and abetting, but it's much more than aiding and abetting. Also, I'd like to clear up a few things that the Opposing Council said. With respect to Council Speaker not reaching out to NYCHA subsequent to July 30th. Well, and this is part of the record. Two emails from Sybil Colon, one dated August 25th, 2015 and August 12th, 2015, in which she is talking with Brian Clark. She's referring to having communicated with the, I think she termed it, with the office that they had the meeting at. So she communicated- That's the political office. Yes, with the political office that they had the meeting at. Two times, August 12th and August 25th, and it's part of the record. So, yes, they did communicate with the Council Speaker's office subsequent to July 30th. We don't know what Brian Honan was doing, all those people who were paid lobbyists. That is true. Why didn't you depose Brian Honan? That's a good question, Your Honor. We had a ton of depositions. I guess we just made a judgment call. We did not find that he would have had anything relevant to say. But now, in retrospect, I think Your Honor's right. We should have deposed Brian Honan. Thank you. All right, thank you very much. Thank you, Your Honor. We'll reserve the decision.